# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-15-348



|  |  |
| --- | --- |
| | **Opinion Delivered** February 10, 2016 |
| MICHAEL R. WOODWARD<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION |
| V. | [NO. 60CV-14-1873] |
| ARKANSAS STATE POLICE COMMISSION<br>APPELLEE | HONORABLE MORGAN E. WELCH, JUDGE |
| | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Trooper First Class Michael Woodward was found in violation of the Arkansas State Police's (ASP) policy concerning arrests and search and seizures. As a result, a letter of reprimand was placed in his folder, he was transferred to Forrest City, and he was suspended without pay for five days by Colonel Stan Witt.[1] Appellant sought review from the Arkansas State Police Commission (Commission), which found that appellant's violation of the policy had been established by a preponderance of the evidence. The Commission upheld the disciplinary transfer and five days' suspension without pay. Additionally, the Commission imposed ten more days' suspension without pay. Appellant appealed this decision to the Pulaski County Circuit Court, which found that substantial evidence

---

[1]Director of the Arkansas State Police.

supported the Commission's findings that appellant violated the policy concerning arrests and search and seizures. The court also found that substantial evidence supported the Commission's disciplinary actions. Appellant timely appeals, arguing that (1) the Commission's decision that appellant violated the ASP policy concerning arrests was arbitrary and was not supported by substantial evidence, (2) the Commission's decision that appellant violated the ASP policy concerning search and seizures was not supported by substantial evidence, and (3) the finding by the Command Staff Review Board (CSRB) that appellant was evasive and not forthright with his answers when asked specific questions about the complaint was not supported by substantial evidence. We affirm.[2]

Our review is directed not to the decision of the circuit court but to the decision of the administrative agency.[3] That is so because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies.[4] Our review of administrative decisions is limited in scope.[5] The decision will be upheld if it is supported by substantial evidence and is not arbitrary, capricious, or characterized by an abuse of discretion.[6]

---

[2]This is the second time this case has been before us. We initially ordered a supplemental addendum due to deficiencies. *Woodward v. Ark. State Police Comm'n*, 2015 Ark. App. 708.

[3]*Ark. State Police Comm'n v. Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999).

[4]*Id.*

[5]*Id.*

[6]*Id.*

Substantial evidence has been defined as valid, legal, and persuasive evidence that reasonable minds might accept as adequate to support a conclusion, without resorting to conjecture.[7] In making a substantial-evidence determination, we review the entire record and give the evidence its strongest probative force in favor of the agency's ruling.[8]

On October 6, 2013, appellant initiated a traffic stop on J.J. Scroggins after Scroggins exited the Yorktown Subdivision River Estates, a gated community.[9] Appellant had already encountered Scroggins inside the subdivision and stopped and questioned him briefly before Scroggins pulled away. Appellant suspected that Scroggins had been trespassing on Roy and Wendy Moss's property and initiated the traffic stop. Appellant asked Scroggins to exit the vehicle; however, appellant allowed Scroggins's girlfriend, Chelsea Finley, to remain inside the vehicle. Appellant questioned Scroggins about why he was inside the subdivision. Scroggins informed appellant that he was there to check on property that belonged to Jerry Moser. Appellant made contact with Moser, who informed appellant that he had given Scroggins the gate code and asked Scroggins to check on his property in the past, but not on the night in question. At some point during the encounter, appellant asked Scroggins if he had any weapons, to which Scroggins replied yes. Appellant then searched the inside of Scroggins's vehicle. He found a loaded rifle commonly used for deer hunting. Appellant called the weapon in and verified it, but he continued to search Scroggins's vehicle. As

---

[7]*Id.*

[8]*Id.*

[9]Appellant and his family lived in the subdivision.

SLIP OPINION

appellant was searching the vehicle, Scroggins approached him. Appellant instructed Scroggins to return to the back of the vehicle, and Scroggins complied. Scroggins then started to question appellant about a warrant or probable cause to search the vehicle, and at that point, appellant placed Scroggins under arrest.[10] Scroggins was transported to the Stone County Sheriff's Department and issued a written warning for criminal trespass. He was released without being charged. Scroggins filed a complaint against appellant on October 12, 2013. An investigation was subsequently initiated by Corporal Jeff Whitlock to look into Scroggins's complaint. As part of the investigation, appellant, Scroggins, and Moser were interviewed and the video of the stop was reviewed. Corporal Whitlock completed the investigation and presented the finished case to CSRB to make a determination whether the complaint was founded or unfounded. CSRB interviewed appellant and accepted witness statements from appellant that basically stated that Scroggins trespassed in the Yorktown Subdivision. CSRB issued its decision on February 7, 2014, finding that appellant had violated ASP policy on arrests and search and seizures and that the complaint was founded. It also noted "that during its review that TFC Michael Woodward was evasive and not forthright with his answers when asked specific questions regarding this complaint." Colonel Witt issued a final administrative decision on February 18, 2014, informing appellant that he had violated ASP policy and that as a result, a letter of reprimand would be placed in his personnel file, he would be transferred to Forrest City, and he would be suspended without pay for five days. Appellant filed a notice of appeal on February 28, 2014.

---

[10]This stop was recorded.

SLIP OPINION

The Commission held a hearing on April 17, 2014, to consider whether Col. Witt's decision should be upheld. At the hearing, Cpl. Whitlock stated that he conducted the investigation into Scroggins's complaint against appellant. He stated that he watched the video of the stop and that he interviewed appellant, Scroggins, and Moser. He said that Moser informed him that Moser did not have a problem with Scroggins being on his property, and that Moser had given Scroggins the day code to the gate and permission to go "down there." Corporal Whitlock testified that appellant told him that trespassing was appellant's probable cause for stopping Scroggins outside of the gate. He stated that appellant denied being upset about how abruptly appellant's first encounter with Scroggins ended. He said that appellant stated that Scroggins was arrested for trespassing and disorderly conduct. Corporal Whitlock stated that the disorderly conduct claim "appeared to be somewhat of an afterthought to accompany the trespassing." He testified that his role was only to investigate, not to make any determinations regarding whether a policy had been violated. He stated that once the investigation was complete, he provided the case file to the CSRB.

On cross-examination, Cpl. Whitlock stated that he never traveled to the subdivision to observe where everything took place. He admitted that he did not follow up with the individuals who had provided statements through appellant because he did not think that it was important. He also stated that he did not interview appellant's wife because she was not present when appellant initiated the stop on Scroggins.

Upon examination by the Commission, Cpl. Whitlock stated that he could not "confirm any information about Mr. Scroggins that would lead [him] to believe that [Scroggins] was a criminal."

Sergeant Greg Alexander testified that he was appellant's supervisor in October 2013. He stated that he received a call from Scroggins regarding appellant, and that he spoke with appellant about the incident. He said that he watched the video and informed appellant that he did not agree with the stop. He also stated that he feared that appellant had violated ASP policy.

On cross-examination, Sgt. Alexander stated that he was appellant's sergeant for over three years and that he generally gave appellant good evaluations. He testified that he would not be willing to take appellant back in his troop because an "element in Stone County" did not like that appellant "led the post in DWI and criminal arrests" in 2013. Sergeant Alexander stated that he felt that appellant would "do better" working in some bigger area.

Major Shawn Garner testified that he was a member of the CSRB. He stated that the board agreed that appellant had violated ASP policy and that the complaint was founded. He said that the board noted that appellant was being evasive during the interview because it wanted Col. Witt to know all of the facts.

On cross-examination, Maj. Garner stated that the board voted unanimously that appellant had violated ASP policy on arrests and search and seizures. He said that to his knowledge, no one had told appellant what was wrong with the arrest and search. However, he stated that it was not the job of CSRB to tell appellant what rule was broken, only to

determine whether there was merit to the complaint against appellant. Major Garner testified

that appellant did not have probable cause for an arrest in this case. He opined that appellant

could perform a limited search of Scroggins's vehicle for a weapon, but that appellant

exceeded the scope of that search. He further testified:

> I am aware of the reason Trooper Woodward said he arrested Mr. Scroggins. He said he was trespassing. In the command staff review board, we relied on the previous investigation by Corporal Whitlock. I believe Mr. Woodward brought in some statements from other property owners on the property where this occurred. I do not know if anyone has ever asked Trooper Woodward to name everyone on whose property he saw J.J. Scroggins that night. I [do] not know who all owned property there. I guess if Trooper Woodward saw Mr. Scroggins on someone's property and that person pulled Trooper Woodward on the property, that could be considered trespassing. I guess he would be within the law to arrest someone if that is what he observed.

On redirect, Major Alexander testified that appellant continued to search Scroggins's

vehicle after appellant found the weapon. On re-cross, Maj. Alexander stated that appellant

made a valid stop under Arkansas Rule of Criminal Procedure 3.1, and that when Scroggins

informed appellant that Scroggins had a weapon, appellant was authorized to conduct a search

for that weapon. Major Alexander stated that he did not recall anything in the video showing

appellant exceeding the parameters of the rule.

Major Henry LaMar testified that he was also a member of CSRB. He stated that the

board wanted Col. Witt to know about appellant's "evasiveness to the extent that it could be

considered not being cooperative." He said that he did not believe appellant was being

"strictly up front" with CSRB.

On cross-examination, Maj. LaMar stated that appellant did not give direct answers

when asked direct questions. He said that he only asked appellant one question and that

appellant answered that question. He testified that the board "did partly rely on the investigation by Corporal Whitlock."

Colonel Witt testified that he decided on what disciplinary actions to take against appellant once he received the memorandum from the CSRB. He said that he decided to transfer appellant because he felt that appellant "would be better suited to a more populated area." He testified that in hindsight, he should have fired appellant.

On cross-examination, Col. Witt stated that he did not actually review the facts, but that he determined punishment based on the CRSB's findings. On re-cross, he stated that appellant admitted that consent should have been received before searching Scroggins's vehicle. He said that, depending on the circumstances, the rule does not always require consent of the person being searched.

Cathy Woodward, appellant's wife, testified that she knew Scroggins and had seen him inside the subdivision numerous times. She stated that she would usually see Scroggins exiting the subdivision as they were coming from church on Sunday nights. She said that in October 2013, they had the only house, besides the spec house, in the subdivision. She stated that the Mosses had a house under construction during that time and that they did not want anyone other than their contractor on the property. She said that the Mosses were "frequently gone from the property." Mrs. Woodward stated that on October 6, 2013, they were having dinner with their daughter, who was home from medical school. She said that when she got up, she could see taillights on the Mosses' property. She stated that she told appellant what she saw. She testified that it was time for appellant to check in and that he said that he would

see who it was. She stated that she walked appellant outside and stayed on the porch. She testified that appellant drove to the bottom of their hill and waited for the vehicle to approach. She said that she could see both vehicles with their windows down, and that all of a sudden, "the truck squealed its tires and shot up the hill." She stated that she was confused by what she saw. She testified that appellant turned around and followed the vehicle out of the gate. She stated that although Cpl. Whitlock investigated the complaint against appellant, she never spoke to the investigator.

Upon being questioned by the Commission, Mrs. Woodward stated that the Mosses' property was the only home at the end of the drive. She stated that she and her family were the only ones that lived in the subdivision, and that the only gate was located above their residence.

Appellant testified that he joined the State Police in February 2008. He stated that prior to this incident, he had only received a letter of warning due to a vehicle accident. He said that the Mosses' property was located next to Brier Creek. He testified that his wife pointed out to him where Scroggins's vehicle was and that she said that she saw taillights on the Mosses' property. He stated that when he looked out of the window, he saw a red truck which he believed belonged to the contractor. He said that one would have to leave the paved road to get where the truck was spotted. He testified that there had been some thefts in the subdivision and some of his neighbors had asked him to keep an eye on their property. He stated that he had come across Scroggins in the subdivision in the past, and that Scroggins would give him names of property owners that he would subsequently find out were

9

fictitious. Appellant testified that Wildlife Officer Chad Cruce had informed him that appellant was "suspected of poaching, night hunting, and other things." He stated that the gate has a code, but that just because Scroggins had the code did not mean Scroggins had permission to be on the property. Appellant testified that once his wife pointed the vehicle out to him, he called in from his lunch hour a few minutes early. He stated that he went down the road to see where the vehicle was. He said that he waited a few minutes and that the vehicle came towards him. He stated that he could then see that it was Scroggins and Scroggins's girlfriend. He said that he had his window down and motioned for Scroggins to stop. He stated that Scroggins pulled up and rolled down his window. Appellant testified that he asked Scroggins what he was doing and he responded that Moser wanted him to check on Moser's property and to make sure that it was okay. Appellant continued, "I said they ought to have called me because I live there and keep an eye on things. I asked what he was doing there, and he said maybe Mr. Moser did not like me or

trust me, then he stomped on the accelerator and sped off." Appellant admitted that this left him confused. He stated that he knew that Scroggins had to be on the Mosses' property. He said that he turned around and followed Scroggins, "deciding if [he] would initiate a traffic stop." He stated that he waited until Scroggins was outside of the gate, so that he would have cell phone reception. He testified that he based Scroggins's trespassing on the fact that he had seen Scroggins on the Mosses' property. Appellant testified in pertinent part:

> When I stopped Mr. Scroggins, I asked him to get out and stand at the back of the vehicle. I asked him for the name and number of the person so that I could verify his story. He had told me Mr. Moser had asked him to check on the property.

I asked him to stand at the back of the vehicle for officer safety. I have known him to carry weapons in the past. I had seen weapons in his vehicle on several occasions during previous traffic stops for speeding or no tags or window tinting or things of that nature. When I called Mr. Moser, he said he had not asked anyone to check on the property and did not know of anyone going down there. He did tell me he knew J.J., but he had not asked him to check on the property. That indicated to me that J.J. had lied to me. That gave me, as a police officer, reasonable suspicion that something was wrong and that I needed to do more investigating to make sure nothing has happened, especially in a community where things had been stolen.

During the conversation, Mr. Moser did state that he had given J.J. permission to look at lots a couple of months ago. I followed up with him about that, and he said it had been a couple of months since he had talked to J.J. I asked Mr. Scroggins if he had a weapon, and he said he did. He did not explain what kind of weapon it was. I started to search for a weapon. I was present when Rule 3.4 of the Arkansas Rules of Criminal Procedure was discussed with Major Garner. I felt I was within the rule when I search for the weapon. I had difficulty finding it. I was actually looking for more than one weapon. I figured he had more than one, like most people in the area, including a handgun. It is not uncommon for people to carry a handgun and a rifle.

The back seat of the extended cab was piled up with camo gear, obstructing my vision to see the weapon. There was a duffle bag, and I eventually found a soft case with the weapon. I pulled it out and examined it. It was loaded with one in the chamber. It was a Ruger 243. They are commonly used for deer hunting. I also talked to his girlfriend, Chelsea Findley. She did not say they were checking on the Moser property. She said they were looking at deer, and that is in the video. That was not consistent with what J.J. said. When I asked a "cue question": "So you were down here checking on property?," she said they were looking at some acreage. Prior to that question, she only mentioned looking at deer.

I believed I had probable cause to arrest J.J. Scroggins for criminal trespass. Probable cause is facts that lead an officer to believe that a crime was committed. I had seen that vehicle and no other red vehicle on the Mosses' property. The statute says that a person commits criminal trespass when they purposely enter the property of another and stay there unlawfully. I believed that what I had seen that night justified me in arresting J.J. Scroggins for criminal trespass. Later, I stated that I also believed I had probable cause to arrest him for disorderly conduct. The facts I saw that led me to believe I had that probable cause were that I had to tell him where to stand twice, and the second time became aggressive, coming at me and raising voice and his hand toward me. I have learned in my past experience that an officer has to take control and not let a situation get out of control. I determined I need to arrest Mr. Scroggins to prevent an altercation. I took him to jail because I was going to charge him with

criminal trespassing and disorderly conduct. I had not found the weapon yet when I arrested him. I then went and found the weapon and made a mental note of anything else that would have related to other charges. I did not know what the Mosses had that could have been taken from their property.

I changed my mind about charging him when I got to the jail. His dad, Shannon Scroggins, was there, and I talked to him for a few minutes. I go to church with him and had known him for a while. We were friends. We talked in the deputy's room. I told him what had happened. He said he would put a stop to what had been going on. I thought it was resolved at that point. It would not have been necessary at that point to file charges, in my experience.

On cross-examination, appellant stated that he did not patrol private property, but that he would stop people in his subdivision as part of his community caretaker function. He said that he was a "little upset" when Scroggins sped off, but that he was not mad. He stated that although he felt that Scroggins was guilty of trespassing, he ultimately arrested Scroggins for being disorderly.

On redirect, appellant stated that Cpl. Whitlock questioned him very rapidly and that before he could completely answer one question, Cpl. Whitlock was asking another. He said that he was trying to explain the situation with the Mosses to Cpl. Whitlock and that several property owners had asked him to look out for their valuables, but that Cpl. Whitlock kept cutting him off.

Upon being questioned by the Commission, appellant stated that he suspected that Scroggins and his friends were behind the thefts in the subdivision. He said that he did not know what Scroggins and his girlfriend were up to, but that the Mosses' contractor had left thousands of dollars worth of tools on the property to keep from having to load them each

day.  He testified that as far as he knew, Scroggins had never been caught stealing.  He said

that if he sees someone he did not know in the subdivision, he would stop and talk to them.

At the conclusion of the hearing, the Commission found that appellant had violated

the ASP policy on arrests and search and seizures.  They upheld the disciplinary action by Col.

Witt and added an additional ten days' suspension to his punishment.  Appellant timely

appealed.

In his first point on appeal, appellant argues that the Commission's decision that he

violated ASP policy concerning arrests was arbitrary and was not supported by substantial

evidence.  It is appellant's burden to prove the absence of substantial evidence.[11]  To establish

an absence of substantial evidence to support the decision appellant must demonstrate that the

proof before the Commission was so nearly undisputed that fair-minded persons could not

reach its conclusion.[12]  The question is not whether the testimony would have supported a

contrary finding but whether it supports the finding that was made.[13]   It is the prerogative

of the Commission to believe or disbelieve any witness and to decide what weight to accord

the evidence.[14]  Administrative action may be regarded as arbitrary and capricious where it

is not supportable on any rational basis.[15]  To have administrative action set aside as arbitrary

---

[11] *Smith*, *supra*.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

and capricious, the party challenging the action must prove that it was willful and unreasoning action, without consideration and with a disregard of the facts or circumstances of the case.[16] We have stated that the requirement that administrative action not be arbitrary or capricious is less demanding than the requirement that it be supported by substantial evidence.[17] An action is not arbitrary simply because the reviewing court would act differently.[18] Finally, we have held that once substantial evidence is found, it automatically follows that a decision cannot be classified as unreasonable or arbitrary.[19]

Appellant relies on testimony from early in the investigation and contends that there were numerous problems with the finding by CSRB and Col. Witt. However, any problems that may have existed were cured when appellant appealed the decision to the Commission. The Commission was presented with all of the evidence, including testimony, statements, interviews, a map, and a video recording. The Commission subsequently found that appellant had violated ASP policy concerning arrests. We, too, have reviewed the evidence presented to support the Commission's findings. We hold that there is substantial evidence to support the Commission's finding that appellant violated ASP policy for arrests, as it is clear that appellant did not arrest Scroggins until he questioned appellant's authority to search his

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

vehicle. Appellant subsequently released Scroggins without charging him with any crime. Because substantial evidence supports the Commission's finding, it is not arbitrary.

Next, appellant argues that the Commission's decision that he violated ASP policy concerning search and seizures was arbitrary and was not supported by substantial evidence. Appellant had already opened the door to Scroggins's vehicle before he asked if Scroggins had any weapons.[20] When Scroggins responded "yes," appellant began to search the vehicle without first seeking permission. Appellant searched the vehicle for several minutes, including behind the driver's seat before he located the rifle. Appellant called in the rifle, but he still continued to search the vehicle. Appellant testified that he continued with the search after the rifle was discovered because he thought Scroggins, like most people in the area, had more than one weapon. It was up to the Commission to believe or disbelieve appellant's testimony. Substantial evidence supports the Commission's finding that appellant violated ASP policy concerning search and seizures. Therefore, the finding is not arbitrary.

Finally, appellant contends that the finding by the CSRB that appellant was evasive and not forthright with his answers when asked specific questions about the complaint was not supported by substantial evidence. Appellant admits that this statement was not adopted by the Commission. Therefore, there is nothing for us to review regarding the statement.

Affirmed.

GLADWIN, C.J., and ABRAMSON, J., agree.
*M. Keith Wren*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Meredith Blaise Rebsamen*, Deputy Att'y Gen., for appellee.

---

[20]Scroggins was standing at the back of the vehicle during this time because appellant had Scroggins get out of the vehicle shortly after making contact with Scroggins.